Bonnie FRANCIS, Administratrix of the ESTATE OF Ryan FRANCIS, Deceased, Plaintiff,

v.

NORTHUMBERLAND COUNTY; Warden Rick Reish, and John Does, Defendants/Third Party Plaintiffs,

v.

Frederick Maue, M.D., Third Party Defendant.

Civil No. 4:06–CV–2297.

United States District Court, M.D. Pennsylvania.

July 7, 2009.

Brian A. Wall, Wayne A. Schaible, McCann, Schaible & Wall, LLC, Philadelphia, PA, for Plaintiff.

Frank J. Lavery, Jr., Robert G. Hanna, Jr., Lavery, Faherty, Young & Patterson, P.C., Harrisburg, PA, for Defendants/Third Party Plaintiffs.

Thomas M. Chairs, Dickie, McCamey & Chilcote, P.C., Camp Hill, PA, for Third Party Defendant.

## MEMORANDUM AND ORDER

JOHN E. JONES III, District Judge.

Currently pending before the Court are five motions. The first is the Motion of Defendants Northumberland County ("Northumberland"), Warden Rick Reish ("Reish"), and certain John Doe prison officials at Northumberland County Prison (collectively, "County Defendants") requesting the ability to supplement their answer to Plaintiff Bonnie Francis' ("Francis") complaint. (Rec. Doc. 83) (the "County Motion to Supplement"). The next motion is one for summary judgment filed by the County Defendants against Plaintiff. (Rec. Doc. 85) (the "County–Plaintiff MSJ"). The third motion is one for summary judgment filed on behalf of Third Party Defendant Dr. Frederick Maue ("Dr. Maue"). (Rec. Doc. 86) (the "Maue MSJ"). The fourth motion is the County Defendants' motion for summary judgment on the counterclaim of Dr. Maue and against Dr. Maue on their third party complaint. (Rec. Doc. 88) (the "County–Maue MSJ"). The final motion is Dr. Maue's motion to amend/supplement his answers to the third party complaint and his cross-claim. (Rec. Doc. 111) (the "Maue Motion to Supplement"). For the reasons that follow, we will grant the County Motion to Supplement, County–Plaintiff MSJ, and the Maue Motion to Supplement. We will grant in part and deny in part the County–Maue MSJ, and we will deny the Maue MSJ in its entirety.

## I. PROCEDURAL HISTORY

The above-captioned case was initiated on November 29, 2006, when Plaintiff Bonnie Francis, as administratrix of the estate of her grandson, decedent Ryan Francis, filed a complaint[1] against the County Defendants. (Rec. Doc. 1). On February 20, 2008, County Defendants filed a third party complaint against Dr. Maue.[2] (Rec. Doc. 42). The next day, Plaintiff filed a cross claim against Dr. Maue, lodging the same causes of action as those contained in County Defendants' third party complaint. (Rec. Doc. 43). On March 18, 2008, Dr. Maue filed a cross claim against the County Defendants incorporating the claims lodged in the initial complaint and asserting an additional right to contribution and/or indemnification based thereon. (Rec. Doc. 48). On August 27, 2008, Defendants amended their third party complaint against Dr. Maue.[3] (Rec. Doc. 73). Subsequently, Plaintiff amended her cross claim against Dr. Maue to reflect the newly added claim contained in the amended third party complaint, (Rec. Doc. 74), and Dr. Maue amended his counterclaim against the County Defendants to include the Fourteenth Amendment claim as a basis for seeking contribution and/or indemnity from the County Defendants. (Rec. Doc. 75).

At some time prior to April 30, 2009, Plaintiff and County Defendants reached a settlement and release agreement (the "Release") wherein Plaintiff agreed to dis-

---

1. The initial complaint contained the following causes of action: (i) reckless conduct/deliberate and intentional conduct; (ii) Fifth and Fourteenth Amendment reckless indifference, pursuant to 42 U.S.C. § 1983 ("§ 1983"); (iii) Fifth and Fourteenth Amendment failure to train, pursuant to § 1983; (iv) Eighth Amendment cruel and unusual punishment, pursuant to § 1983; (v) wrongful death, pursuant to 42 Pa.C.S.A. § 8371; and (vi) survival action, pursuant to 42 Pa.C.S.A. § 8202; 20 Pa.C.S.A. § 3371.

2. The initial third party complaint contained the following causes of action: (i) medical malpractice; (ii) wrongful death; and (iii) survival action.

3. The amended third party complaint asserted a Fourteenth Amendment claim, pursuant to § 1983, in addition to the three causes of action asserted in the initial third party complaint.

miss the claims against County Defendants in exchange for $360,000.[4] (*See* Rec. Doc. 83–3). On April 30, 2009, County Defendants filed a motion to supplement their answer to the Plaintiff's complaint to include the Release as a defense. (*See* Rec. Doc. 83). Plaintiff concurred in that motion. Dr. Maue asserted that he would not oppose the motion so long as he could amend his response to plead the Release as a defense.[5] (Rec. Doc. 95). On May 1, 2009, the County Defendants filed a motion for summary judgment against Plaintiff based upon, *inter alia,* the Release. (Rec. Doc. 85). Plaintiff asserted that her non-opposition to that motion was contingent upon the continuation of her claims against Dr. Maue. (*See* Rec. Doc. 85–3). On the same date, the County Defendants filed a motion for summary judgment on the counterclaim of Dr. Maue. (Rec. Doc. 88). Also on that date, Dr. Maue proceeded to file a motion for summary judgment against the claims contained in the Plaintiff's complaint and those contained in the County Defendants' third party complaint. (Rec. Doc. 86). Having been fully briefed, these motions are now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Turner v. Schering–Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990). The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial." *Young v. Quinlan,* 960 F.2d 351, 357 (3d Cir.1992). Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw from them. *See Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the nonmoving party will bear the burden of proof at trial. *See id.* at 325, 106 S.Ct. 2548.

Rule 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e). The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (1986).

It is important to note that "the non-moving party cannot rely upon conclusory

4. Dr. Maue refused to contribute any monetary amount or other consideration towards the settlement figure. Accordingly, by the terms of that agreement, Plaintiff expressly reserved her right to maintain any and all claims against Dr. Maue. (Rec. Doc. 88–3). However, she also agreed to "fully and completely indemnify and hold harmless [County Defendants] from any and all potential recovery that [Dr. Maue] may have by way of Cross-claim, Third Party Claim or Counterclaim ...." (*See id.*). Plaintiff further agreed to satisfy any decree, judgment, or award on the behalf of the County Defendants and to the full extent of their liability for contribution, indemnity, setoff, or liability over. (*See id.*).

5. Dr. Maue formally filed his motion to supplement on May 21, 2009. (Rec. Doc. 111). While the County Defendants did not oppose this motion, Plaintiff did oppose the motion. (*See id.*).

allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 511 (3d Cir.1994) (citation omitted). However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.* at 248, 106 S.Ct. 2505. A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III. STATEMENT OF MATERIAL FACTS

The circumstances undergirding the instant lawsuit have their genesis in a truly tragic set of events. In February 2006, Ryan Francis ("Mr. Francis") lost his mother, girlfriend, and three others in house fire. (Rec. Doc. 87 ¶ 11). Mr. Francis was not permitted to be a pallbearer at the funeral of his girlfriend, which occurred on March 7, 2006. (*See id.* ¶ 14). Mr. Francis became belligerent at the funeral was eventually arrested and transported to the Northumberland County Prison ("NCP"), where he was charged with disorderly conduct, making terroristic threats, and drug possession. (*Id.*). Failing to make bail, Mr. Francis was committed to NCP through Lieutenant Bruce ("Lieut. Bruce"). (*Id.* ¶ 15). The police informed Lieut. Bruce that Mr. Francis had expressed suicidal ideation. (*Id.* ¶ 16). Lieut. Bruce placed Mr. Francis on close suicide watch ("close watch"), which entailed a cell check every 15 minutes.[6] (*See* Rec. Docs. 87, 109 ¶ 17). Lieut. Bruce then informed Warden Reish and Dr. Maue[7] of the situation.

On that same date, Dr. Maue performed an emergency psychiatric evaluation of Mr. Francis that last approximately two hours. (Rec. Doc. 87 ¶¶ 21–22). During this evaluation, Mr. Francis expressed a desire to see his grandfather and Dr. Maue granted this request. (*Id.* ¶¶ 23–24). Dr. Maue testified that during this evaluation, Mr. Francis "was suffering from depression . . . loss of appetite, difficulty . . . sleeping, nightmares and flashbacks regarding the house fire." (*Id.* ¶ 25). Dr. Maue also testified that Mr. Francis appeared overcome with guilt and shame as a result of

---

**6.** There were only two levels of "watch" for monitoring suicidal inmates. One was the "close" or "Q 15" watch and the other was a "constant watch," which entailed uninterrupted, continuous monitoring of the inmate. *See* Maue Dep. 47.

**7.** Dr. Maue is a psychiatrist employed by Holy Spirit Hospital in Camp Hill, Pennsylvania. The Northumberland County Commissioners entered into an agreement with Holy Spirit Hospital whereby the latter would provide psychiatric evaluations at NCP. (Rec. Doc. 89 Ex. B). At all relevant times, those psychiatric services were provided by Dr. Maue on behalf of Holy Spirit Hospital. (*Id.* Exs. A–B). At the time of the events in question, Dr. Maue had had extensive experience as a psychiatric consultant for prisons, working in such a capacity at the Allegheny County Jail (1981–1984), the State Correctional Institute at Muncy (1984–1992), the Northumberland County Prison (1997–at least the time of the deposition), the Snyder County Prison (1999–at least the time of deposition), and the Perry County Prison (approximately 2003–2007). Maue Dep. 6:16–7:8, December 17, 2007.

being the lone survivor of the house fire. (*Id.*). Dr. Maue noted multiple prior suicide attempts and positive suicidal ideation in his evaluation of Mr. Francis. (*Id.* ¶ 26). On a suicidality scale of 1–10, 10 being the most suicidal, at his deposition Dr. Maue rated Mr. Francis as a 10.[8] Maue Dep. 61:23–25.

After the evaluation of Mr. Francis, Dr. Maue informed Lieut. Bruce that the close monitoring of Mr. Francis needed to be continued.[9] Maue Dep. 73:22–73:1. At the time of this determination, the two maximum security cells located in the basement of NCP were unoccupied.[10] Reish Decl. ¶ 3(*l*). These cells were utilized for, *inter alia*, housing inmates who posed a great risk of harm to themselves and

others.[11] *See id.* ¶ 3(m). Warden Reish claims that if Dr. Maue had ordered a constant watch, Mr. Francis would have been placed in one of these cells.[12] *Id.* ¶ 3(m). However, since Dr. Maue merely continued the close watch, Mr. Francis was not transferred to one of these cells.[13] *See id.* ¶ 3.

After his evaluation of Mr. Francis, Dr. Maue prescribed an anti-anxiety and anti-depression medication for him and ordered that the prison health counselor evaluate him the next day. (Rec. Doc. 87 ¶ 29). Dr. Maue planned to evaluate Mr. Francis the next day and indicated that it would be in Mr. Francis' best interest to be transferred to a psychiatric hospital and that he would attempt to effectuate such a trans-

8. Indeed, in his sworn deposition testimony, Dr. Maue stated that Mr. Francis was the most suicidal person he had ever seen in his approximately 25–30 years of examining inmates. Maue Dep. 61:19–22. However, in his unsworn declaration, Warden Reish asserted that he did not learn of this opinion until the deposition of Dr. Maue on December 17, 2007. Reish Decl. ¶ 3(ff) Aug. 26, 2008.

9. At no time during the events in questions did Dr. Maue ever inquire as to the extent of monitoring engendered by the "close watch" he mandated. Maue Dep. 80:17–81:1; 89:6–8. However, Dr. Maue testified that he believed the "close watch" he ordered would require someone to be within eyesight and watching Mr. Francis at all times. *Id.* 24:16–25. Nonetheless, Dr. Maue never specifically instructed Warden Reish that Mr. Francis needed to be monitored on a continual basis. *Id.* 89:9–13.

Further, Dr. Maue testified that while he is now familiar with the prison policy regarding, he is not sure if he was aware of the difference "watch" definitions at the time of the events in question. *Id.* 89:1–5. This policy clearly defines a "close" or "Q 15" watch as one that is "less restrictive than [a] constant [watch] ... visual checks are made on an irregular schedule that does not develop a pattern [with] at least one [check] within every fifteen minute period." (Rec. Doc. 89 ¶ 29).

10. However, Deputy Warden John Conrad testified that although these cells had been in use in the months prior to the incident in question, they were not approved by the Department of Corrections because of fresh air and space requirements. Deputy Warden John Conrad Dep. 84:16–22, April 28, 2008. Accordingly, Deputy Warden Conrad testified that at the time of the events in question, NCP did not have adequate facilities available for suicidal inmates. *Id.* 85:18–23. This testimony is contradicted by the testimony of Warden Reish, *supra*, and also by inmate records and shift supervisor's logs, (*see* Rec. Doc. 115 Exs. R, S, T, U, V, W).

11. Warden Reish avers that these cells are free from fixtures from which inmates can attach items to effect strangulation. Reish Decl. ¶ 3(n). Further, Reish contends that inmates placed in these cells are issued suicide resistant clothing. *Id.* ¶ 3(*o*).

12. Warden Reish also claims that if Dr. Maue had conveyed Mr. Francis' suicidality level to him, Mr. Francis would have been placed in the maximum security cells. *Id.* ¶ 3(hh).

13. Nonetheless, it the policy and practice of NCP is that Warden Reish or Dr. Maue are the only individuals authorized to remove the inmate from suicide watch once such a watch is ordered. *Id.* ¶ 3(u).

fer. Maue Dep. 15:23–16:1.[14] In this vein, Dr. Maue testified that he spoke to the director at Sunbury Hospital about transferring Mr. Francis to the Behavioral Health Unit for inpatient psychiatric care. *Id.* 86:4–14. Dr. Maue was informed that such transfer could not be effectuated unless the charges against him were dropped.[15] *Id.* 87:17–22. With the prospect of admission to a psychiatric hospital being minimal, Mr. Francis was placed in a cell at NCP with another inmate.[16] Lieutenant James Bruce Dep. 48:7–10, December 18, 2007.

Dr. Maue testified that the next day, March 8, 2006, he called Warden Reish to reiterate the need for Mr. Francis' suicide watch[17] and for his expeditious transfer to psychiatric hospital. Maue Dep. 20–23;

88:13–21. In the late morning hours of that day, prison nurse Patti Wojcik ("Nurse Wojcik") conducted a medical intake screening of Mr. Francis. (Rec. Doc. 94 Ex. J). Although Nurse Wojcik could not specifically remember if this screening involved a review of Dr. Maue's notes from the psychiatric evaluation conducted the previous evening, she testified that she "probably" did review his notes, since they were available to her and it was her standard practice and custom to review them when available.[18] Patti Wojcik Dep. 20:17–21, December 18, 2007. During her evaluation of Mr. Francis, Nurse Wojcik observed that he was laughing and playing cards, and therefore she concluded that he was no longer a threat to himself or others.[19] *See* Wojcik Dep. 37:4–7.

14. Dr. Maue testified that there were two ways to accomplish such a transfer. The first was to commit Mr. Francis to the local community hospital, Sunbury Hospital. Maue Dep. 19:5–9. The other was to get an immediate commitment on Mr. Francis and then have him transferred to a state hospital. *Id.* 19:13–15. However, Dr. Maue implied that given Mr. Francis' suicidality level, the latter really was not an option, since there is usually a long wait list for such commitments. *Id.* 19:16–18. Indeed, when such an inquiry was made, Warden Reish learned that there was a five month wait for a bed at the Warren State Hospital. *Id.* 20:19–21.

15. In fact, Dr. Maue asserted that once the charges were dropped Mr. Francis could be *immediately* transferred to Sunbury Hospital. *Id.* 20:13–16.

16. It is customary to house inmates on suicide watch with other inmates so that the other inmates can talk to the suicidal inmates and assist in observing them. Maue Dep. 101:14–102:1. Housing the suicidal inmates with other inmates allows them to avoid solitude and isolation, which tends to exacerbate their suicidal feelings. *See id.* 101:14–102–8.

17. Again, the procedures associated with Mr. Francis' suicide watch level were never discussed and Dr. Maue never expressed his

belief that Mr. Francis should be continually monitored. *See* Maue Dep. 88:13–21. During the discussion, Dr. Maue never inquired as to Mr. Francis' condition because he felt that it could not have improved. *Id.* 96:21–97:15. He testified that this was not an inquiry he should have made, since Mr. Francis was scheduled to see the prison nurse and counselor that day. *Id.* 98:20–99:2.

18. Dr. Maue's notes included references to Mr. Francis' past suicide attempts as well as Dr. Maue's observation that Mr. Francis exhibited positive suicidal ideation. Wojcik Dep. 21:15–23. The notes also memorialized Dr. Maue's observation that Mr. Francis exhibited signs of grief and depression. (Rec. Doc. 88 Ex. L). However, Dr. Maue's notes did not mention the severity of Mr. Francis' suicidal ideation, grief level, or depression level.

19. Nurse Wojcik acknowledges reading the suicide prevention screening questionnaire completed by the arresting and transporting officer prior to her screening of Mr. Francis. Wojcik Dep. 33:5–9. On that questionnaire, the officer noted his belief that Mr. Francis was a suicide risk and indicated the suicide risk factors that led him to that conclusion. Wojcik Dep. 33–36. Nonetheless, the laughter and playfulness exhibited by Mr. Francis during Nurse Wojcik's evaluation of him led

Sometime after Nurse Wojcik's evaluation of Mr. Francis, prison guard Brian Wheary ("Guard Wheary") asked her if monitoring of Mr. Francis could be terminated.[20] *Id.* 39:14–17. Since the documents cataloging the fifteen minute checks on Mr. Francis did not reference "suicide,"[21] Nurse Wojcik was under the impression that the check on Mr. Francis was merely a customary "new commitment check," which were routinely performed on all new admitees to NCP.[22] *See* Wojcik Dep. 31:11–14; 40:5–15. In her mind, this belief was buttressed by the fact that Dr. Maue's notes did not include any reference to "suicide watch," "Q 15 watch," or "constant watch," (Rec. Doc. 88 Ex. L), as was the customary precaution when such watches were imposed, Wojcik Dep. 37:20–23; 48:15–22.[23] This determination, com-

---

her to the conclusion that he no longer harbored suicidal feelings or displayed any of the suicide risk factors. *See* Wojcik Dep. 36:18–20; 37:4–7. However, it appears that such serenity subsequent to strong suicidal ideation could indicate that Mr. Francis had already resolved to end his life. *See* Maue Dep. 102:21–103:7.

20. While Warden Reish or Dr. Maue were the only individuals who could remove an inmate from suicide checks, Wojcik Dep. 40:5–15, Nurse Wojcik had the authority to remove "new commitment checks," the customary checks performed on all new members of the NCP prison population, *id.* 31:21–24.

21. The security check sheet, the completion of which is the responsibility of the prison guards, indicates that the reason for Mr. Francis' checks was "new commitment." (Rec. Doc. 88 Ex. H). It mentioned nothing of suicide. *Id.* Dr. Anderson, a board certified psychologist, stated that NCP personnel should have documented the suicide watch on the security check sheet and that a failure to do so constituted a breach of duty and a violation of NCP practice and protocols. Anderson Dep. 55–57.

22. We note that Guard Wheary did not disabuse her of this perception, *id.*, and probably could not do so, as it was not customary for correction officers or administrative personnel to have access to the medical records of prisoners, *see* Dr. Douglas Anderson Dep. 41:9–23.

23. Dr. Maue acknowledges that he would normally note if an inmate's suicidal ideation was significant, Maue Dep. 78:11–17, but disputes the contention that it was customary to note an inmate's suicide watch level, *id.* 79:18–80:7. Indeed, both Dr. Maue and Nurse Wojcik testified that the shift lieutenants would convey information such as suicide watch level to the nurses and other staff between shifts. *See* Maue Dep. 91:7–12, 92:10–16; Wojcik Dep. 30:7–31:6. Dr. Maue testified that he did not memorialize Mr. Francis' suicide watch level because he intended to, and did, address the issue with Lieutenant Bruce and assumed that Nurse Wojcik and all others to whom the information might be essential would receive the information through their shift lieutenant. Maue Dep. 92:10–93:10. Nurse Wojcik testified that no one told her that Mr. Francis was a suicide risk. Wojcik Dep. 31 31:7–10.

Further, Nurse Wojcik's nescience to the severity of Mr. Francis' suicidal condition appears to have been aided by the fact that prior to Mr. Francis' death, Dr. Maue's notes did not indicate that he had spoken to Lieut. Bruce about Mr. Francis' watch level, or did they mention that Dr. Maue had concerns over Mr. Francis' grief and depression levels. (*See* Rec. Doc. 88 Ex. L); Maue Dep. 68:15–69:15; 71:24–73:19. In fact, at the time of Mr. Francis' death, Dr. Maue's notes contained no references to his interactions with Lieut. Bruce or Warden Reish, nor did they mention the "strategy" employed in Mr. Francis' psychiatric care. (*See* Rec. Doc. 88 Ex. L); Maue Dep. 68:15–69:15. While Dr. Maue contends that this information should not have necessarily been documented in his notes, Maue Dep. 92:10–16, 93:7–10, after Mr. Francis' death, Dr. Maue inserted an "addendum note," dated March 9, 2006, which reflected all of this information and dates relevant thereto. (*See* Rec. Doc. 88 Ex. L). Dr. Maue testified that the *post hoc* memorialization of these facts was not intended as a cover-up, but was done in the normal course of any prison suicide case and because he wanted to "document ... what had happened." Maue Dep. 67:18–19; 68:8–14.

bined with her observation that Mr. Francis was not a threat to himself or others, led her to respond affirmatively to Guard Wheary's inquiry.[24] Nurse Wojcik testified that if Dr. Maue had noted the suicide watches in his notes, she would not, and could not, have terminated those watches.[25] *Id.* 48:19–22.

On March 9, 2006 Mr. Francis' cell mate was removed for a judicial hearing. Reish Dep. 66. After receiving his medication at approximately 1:23 p.m., Mr. Francis was left unmonitored in the cell for some period of time. At 1:40 p.m. the prison staff was conducting its end of shift prison count and discovered that Mr. Francis had committed suicide by fastening a bed sheet to a window fixture and strangling himself. (Rec. Doc. 87 ¶¶ 53–55).

## IV. DISCUSSION

Since our resolution of the two Motions to Supplement will inform our resolutions of the three Motions for Summary Judgment, we shall first resolve the former.

### A. Motions to Supplement

■ Federal Rule of Civil Procedure 15(d) states, in pertinent part, "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." [26] Fed.R.Civ.P. 15(d). Both the County Defendants and Dr. Maue move to supplement their answers to include the Release as a defense. The Release occurred after the pleadings sought to be supplemented, and therefore Rule 15(d) is the appropriate mechanism for altering those pleadings.

■ Both the Plaintiff and Dr. Maue concur in the County's Motion to Supplement and that motion will therefore be granted. However, the Plaintiff does oppose Dr. Maue's Motion to Supplement. The basis for this opposition is that Dr. Maue allegedly has no right to plead release because he was not a party to the Release. Supplementation of a pleading is a procedural matter, but Plaintiff's argument does not attack the procedural appropriateness of Dr. Maue's contemplated supplementation. Rather, Plaintiff's argument addresses the substantive merits of the defense Dr. Maue seeks to supplement. Since we believe that Dr. Maue's supplementation is procedurally correct, and since no party provides us with any reason to doubt same, we see no reason to deny Dr. Maue's Motion to Supplement. Accordingly, we will grant both the County's Motion to Supplement and Dr. Maue's Motion to Supplement, which will allow us to consider the defense of release in the con-

---

Needless to say, Nurse Wojcik did not have the benefit of this addendum note when examining Mr. Francis or when determining that he could be removed from what she thought were new commitment checks.

**24.** Nurse Wojcik testified that the security check sheet had no effect on her decision to terminate Mr. Francis' checks because she did not see the document, as it was not customary for her to see the security check sheets of inmates. Wojcik Dep. 38:1–25. There is uncontradicted evidence that Warden Reish was not aware that Nurse Wojcik had terminated Mr. Francis' checks prior to his death. Reish Dep. 70.

**25.** In a moment of candor, Dr. Maue testified at his deposition that if he could do it all over again, he would have placed Mr. Francis' suicide level in his psychiatric notes for Nurse Wojcik to see. Maue Dep. 67:1–8; 92:6–9.

**26.** We do take time to note that there is distinction between *amending* a pleading and *supplementing* a pleading. *Amending* a pleading involves *entirely replacing the earlier pleading* with a new pleading containing matters that occurred *prior* to the filing of the original pleading, while *supplementing* a pleading involves *merely adding* to the original pleading events occurring *subsequent* to the earlier pleading. 6A Charles Alan Wright,

text of the Motions for Summary Judgment filed in this case.[27]

## B. The County–Plaintiff MSJ

While the County–Plaintiff MSJ requests "summary judgment and the dismissal of all claims," it also asserts that County Defendants will file a separate motion of summary judgment addressing its Third Party Complaint against Dr. Maue and Dr. Maue's counterclaim.[28] (Rec. Doc. 85). Accordingly, we construe the County–Plaintiff MSJ to exclusively address the claims asserted by Plaintiff against the County Defendants. In light of the Release, the Plaintiff does not oppose the County–Plaintiff MSJ. Dr. Maue has filed a brief in opposition, however, after examination of his brief in opposition, we are convinced that it is aimed exclusively towards the County–Maue MSJ and does in any way address the merits of the County–Plaintiff MSJ. Thus, the arguments he interposes in his brief in opposition are inapposite and irrelevant to our resolution of the County–Plaintiff MSJ,[29] which we construe as unopposed. Accordingly, we will grant the motion and dismiss all claims asserted by Plaintiff against County Defendants.

## C. The Dr. Maue MSJ

The Dr. Maue MSJ addresses the claims found in: (i) the County Defendants' Third Party Complaint against Dr. Maue; (ii) the Plaintiff's cross claim against Dr. Maue; and (iii) Dr. Maue's counterclaim against the County Defendants. We address each of these sets of claims *seriatim*,[30] noting that since this is Dr. Maue's motion we must construe all facts in the light most favorable to the Plaintiff and County Defendants.

To reiterate, both the County Defendants' Third Party Complaint and the Plaintiff's cross claim contain the following causes of action: (i) denial of adequate medical care in violation of the Fourteenth Amendment; (ii) medical malpractice; (iii) wrongful death; and (iv) a survival action.[31] The Third Party Complaint also requests indemnity from Dr. Maue.

 The Fourteenth Amendment inadequate medical care claim [32] is asserted

ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1504 (3d ed. 2004) (emphasis added).

**27.** We note that this determination does not in any way reflect our opinion of the meritoriousness of the items to be supplemented. In fact, we will have the opportunity to pass on the merits of the supplemented items, as both County Defendants and Dr. Maue incorporate them into their motions for summary judgment. Thus, instead of addressing the substantive arguments against Dr. Maue's supplementation as a part of the analysis of his motion to supplement, we elect to reserve consideration of that argument for our resolution of the Maue MSJ.

**28.** County Defendants elected to brief the motions jointly.

**29.** Likewise, Plaintiff's statements and arguments against Dr. Maue's brief in opposition (Rec. Doc. 101) are irrelevant to our disposition of the County–Plaintiff MSJ, as they only address the merits of the County–Maue MSJ.

**30.** The County Defendants' Third Party Complaint and the Plaintiff's cross claim advance essentially identical claims against Dr. Maue, the only difference being that the Plaintiff does not make an indemnity claim against Dr. Maue, as County Defendants do. Accordingly, we will address the merits claims jointly.

**31.** Since there is no independent cause of action for survival claims in Pennsylvania, we interpret the Third Party Complaint and cross claim to include such a "claim" for the purpose of damages. Therefore, we will not address it as a substantive matter at the summary judgment stage.

**32.** We take the time to note that the Fourteenth Amendment, not the Eighth Amendment, is the proper constitutional provision under which to be proceeding, as the former's safeguards are applicable to pretrial detainees, while the latter's safeguards are applicable to convicted inmates. *See Sylvester v. City*

pursuant to § 1983.[33] The standard for a Fourteenth Amendment claim for inadequate medical care is similar to the standard for an Eighth Amendment inadequate care claim. *King v. County of Gloucester*, 302 Fed.Appx. 92, 97 (3d Cir. 2008). When asserting an inadequate medical care claim in the context of a prison suicide case, a plaintiff "has the burden of establishing three elements: (i) the detainee had a particular vulnerability to suicide; (ii) the custodial officer ... knew or should have known of that vulnerability; and (iii) [the officer] 'acted with reckless indifference'[34] to the detainees' particular vulnerability." *Tatsch–Corbin v. Feathers*, 561 F.Supp.2d. 538, 543–44 (W.D.Pa.2008) (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991)). Therefore, "when the factual scenario presented by a plaintiff suggests that [the defendant] should have known that a prisoner was a suicide risk, and failed to take necessary and available precautions to protect the prisoner from self-inflicted wounds" the claim will survive. *Id.* (citing *Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir.1988)).

■ Dr. Maue asserts that a Fourteenth Amendment inadequate care claim is unsustainable for two reasons. First, he claims that if he was working in his official capacity for NCP, as is required by § 1983, the Release protects him from liability. In this vein, Dr. Maue reasons that since the Release purports to absolve Northumberland County from all claims arising out of Mr. Francis' suicide, he must necessarily fall under the penumbra of "Northumberland County," and hence be discharged from liability on the § 1983 claim because he was executing his duties as a state actor.[35] In the alternative, Dr. Maue argues that there is no evidence to support the contention that he was deliberately indifferent to Mr. Francis' medical needs.

■ With regard to the effect of the Release, that document remises, releases, and forever discharges the County Defendants from any and all liability associated with the suicide of Mr. Francis. (Rec. Doc. 83 Ex. A). That document also reserves the Plaintiff's right to pursue any and all claims against Dr. Maue. It is well settled that bringing a constitutional claim against a state actor in his or her official capacity is tantamount to lodging the claim against the state itself, since it is the real party in interest. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109

---

*of Newark*, 120 Fed.Appx. 419, 423 (3d Cir. 2005).

**33.** 42 U.S.C. § 1983 states, in pertinent part "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." 42 U.S.C. § 1983.

**34.** "Reckless indifference" is established when a defendant "know[s] of and disregard[s] an excessive risk to inmate health or safety." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir.2003).

**35.** "[M]edical personnel can treat a prisoner only with the state's authorization," since inmates cannot secure their own medical providers. *Tatsch–Corbin v. Feathers*, 561 F.Supp.2d 538, 543 (W.D.Pa.2008) (citations omitted). Thus, "[a] direct employment relationship with the state is not required to find that a physician who treated a prison inmate acted under color of state law." *Id.* (citations omitted). Accordingly, "[a] physician under contract to provide medical services to prison inmates, but not employed directly by the state, acts under color of state law when treating an inmate." *Id.* (citations omitted). Since Dr. Maue was under contract with NCP to provide medical services to inmates, we agree with his contention that he was acting under the color of state law when treating inmates at NCP.

S.Ct. 2304, 105 L.Ed.2d 45 (1989).[36] Accordingly, any claim against Dr. Maue in his official capacity is akin to a claim against Northumberland County, which has already been discharged for liability. Therefore, the Release implicitly bars claims against Dr. Maue in his official capacity.

 However, we cannot say the same for claims against Dr. Maue in his individual capacity because the County is not the real party in interest when such claims are lodged; in such circumstances, Dr. Maue is the sole real party in interest. *See Pennhurst*, 465 U.S. at 104, 104 S.Ct. 900. Therefore, the Release does not implicitly discharge the claims against Dr. Maue. Further, the Release itself explicitly reserves to Plaintiff the right to assert claims against Dr. Maue and contemplates that such claim may be asserted against him in his individual capacity.[37] Accordingly, since the Release does not implicitly or explicitly discharge any potential liability on the part of Dr. Maue, we cannot hold that it provides a viable defense against the § 1983 claim asserted against him in his individual capacity.

 As to Dr. Maue's alternative argument for dismissing the § 1983 claim, we believe that there is ample evidence from which a reasonable jury could conclude that he acted with deliberate or reckless indifference in treating Mr. Francis. This conclusion is based upon the following facts. Dr. Maue, by his own admission, was acutely aware of Mr. Francis' severe suicidality. Given his extensive experience with treating inmates, we believe that a reasonable jury could conclude that Dr. Maue should have been aware that there are very discrete protocols associated with the varying levels of suicide watch employed at prisons in this commonwealth. Nonetheless, there is record evidence from which a reasonable jury could infer that Dr. Maue failed to familiarize himself with the niceties of the protocols implemented at NCP.[38] As a result, Dr. Maue failed to correctly communicate to NCP officials the appropriate suicide watch level under which Mr. Francis should have been monitored. Indeed, Dr. Maue instituted a suicide watch level for Mr. Francis that was less rigorous and less exacting than the watch level that he determined to be appropriate, given Mr. Francis' extreme suicidality.[39] A reasonable jury could infer

**36.** This notion is applicable whenever " 'the state is the real, substantial party in interest.' " *Pennhurst v. Halderman*, 465 U.S. 89, 104, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (discussing sovereign immunity) (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 465, 65 S.Ct. 347, 89 L.Ed. 389 (1945)).

**37.** As Dr. Maue himself notes, when construing the effect and scope of a release, we must treat it as a contract. *See G.R. Sponaugle & Sons, Inc. v. Hunt Const. Group, Inc.*, 366 F.Supp.2d. 236, 242 (M.D.Pa.2004) (construing Pennsylvania law). Consequently, when construing same, we must give effect to the intent of the parties, which is most accurately evinced by the language of the document itself. *See id.* Accordingly, we note that the Release states, in relevant part, that Plaintiff "reserves the right ... to make [the] claim that ... [Dr.] Maue ... is solely liable to [Plaintiff]." (Rec. Doc. 83 Ex. A). In reserving this right to hold Dr. Maue solely liable,

Plaintiff clearly manifests her intention to makes claims against Dr. Maue in his individual capacity.

**38.** While Dr. Maue testified that he was unsure of whether or not he was familiar with the different protocols in existence at the time of the events in question, he has also admitted that he thought he was mandating a constant watch when he instructed Lieut. Bruce and Warden Reish that Mr. Francis should be under a "close watch." As we have noted, a "close watch" and a "constant watch" are two very different watch levels that involve two very different protocols. The fact that Dr. Maue conflated the protocols associated with those two watch levels reasonably lends itself to the inference that he was not familiar with the suicide watch levels at NCP.

**39.** Further, Dr. Maue never attempted to double check the protocols associated with the

that these actions were the first dominoes in a series of unfortunate events that ultimately culminated in Mr. Francis ending his own life.[40]

■ Accordingly, we believe that a reasonable jury could conclude that Dr. Maue knew that Mr. Francis was a suicide risk, and failed to take necessary and available precautions to protect Mr. Francis' well-being when he failed to familiarize himself with the NCP suicide watch protocols and when he failed to double check the protocols associated with the watch level he instituted.[41] Consequently, we believe that there is enough evidence to show that Dr. Maue was deliberately indifferent to Mr. Francis' medical needs.[42] We will there-

fore deny the Maue MSJ to insofar as it relates to the § 1983 Fourteenth Amendment claim lodged against Dr. Maue in his individual capacity.

■ We now turn to the medical malpractice claim lodged against Dr. Maue.[43] In order to established a claim for medical malpractice, a plaintiff must show the following: "(i) a duty owed by the physician to the patient; (ii) a breach of that duty by the physician; (iii) that the breach was the proximate cause of the harm suffered; and (iv) that the damages suffered were a direct result of the harm." *Freed v. Geisinger Med. Ctr.*, 971 A.2d 1202, 1206 (Pa.2009) (citing *Hightower–Warren v. Silk*, 548 Pa. 459, 698 A.2d 52, 54 (1997)).[44] Dr. Maue argues that he is

suicide watch level that he had instituted. If he had done so, he would have realized that it was actually less rigorous than the level under which Mr. Francis should have been supervised.

40. Indeed, if Dr. Maue had correctly communicated the need for Mr. Francis to be under a constant watch, Nurse Wojcik would have never mistaken the watch for a new commitment watch and consequently would have never removed Mr. Francis from the watch. Accordingly, Mr. Francis would never had had the opportunity to commit suicide.

41. We also believe that there is record evidence from which a reasonable jury could infer that Dr. Maue was recklessly indifferent when he failed to document Mr. Francis' suicide watch level in his medical records, as Nurse Wojcik has testified that such documentation was customary and since he amended the record to include this information after Mr. Francis' death.

42. We note that Dr. Maue argues that we should not consider Dr. Anderson's testimony that Dr. Maue's conduct *could* have constituted reckless indifference because it is insufficient, as it does not contain the requisite level of professional certainty. However, we do not rely on Dr. Anderson's opinion in this regard for a different reason, namely because "reckless indifference" is a legal concept and Dr. Anderson is incompetent to testify to it because he is a medical expert, not a legal expert. However, as stated in the text, a

thorough review of the facts in this case lead us to the conclusion that a reasonable person could determine that Dr. Maue's conduct qualifies as reckless indifference. Therefore, Dr. Maue's argument regarding Dr. Anderson's testimony does not advance his position in any appreciable way.

Further, in light of the conclusion recounted in the text above, and in the interests of judicial economy, we decline to address additional bases on which Dr. Maue's deliberate indifference could be grounded. For our purposes at the summary judgment stage, it is enough that we have determined that deliberate indifference could be based upon at least some portions of the record evidence, meaning that the Fourteenth Amendment claims against Dr. Maue will survive summary judgment.

43. Medical malpractice is a state law claim. Accordingly, since all parties reside in Pennsylvania and all relevant events occurred there, we look to the law of that state for guidance on the instant medical malpractice claim.

44. "Expert testimony generally is required in a medical malpractice action in order to establish the proper standard of care, the defendant's failure to exercise that standard of care, and the causal relationship between the failure to exercise the standard of care and the plaintiff's injury." *Freed*, 971 A.2d at 1206 (citing *Hightower–Warren*, 698 A.2d at

entitled to summary judgment on the medical malpractice claim because he is immune from such a suit,[45] and because there is insufficient evidence to establish a duty and/or causation. We address these contentions in sequence.

Although Dr. Maue asserts that PSTCA immunity is granted under 42 Pa.C.S. § 8541, that provision applies solely to government agencies, not to employees. The only discernable provision under which Dr. Maue can claim immunity is § 8542, which states, "An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee, which are within the scope of his office or duties only to the same extent as his employing agency and subject to the limitations imposed by this subchapter." 42 Pa.C.S. § 8542(b).

Accordingly, we must determine if Dr. Maue qualifies as an "employee."[46] Dr. Maue asserts that he is an employee because *Walls v. Hazleton State Gen. Hosp.,* 157 Pa.Cmwlth. 170, 629 A.2d 232 (1993), stands for the proposition that a prison doctor, while not a traditional employee, may still qualify as an employee for PSTCA immunity purposes if he acts "on behalf of the government unit whether on a temporary or permanent basis." *Higby*

*Development, Inc. v. Sartor,* 954 A.2d 77, 85 (Pa.Commonw.Ct.2008) (citing *Walls,* 629 A.2d 232). The County Defendants claim that *Walls* is inapposite because the definition of "employee" was altered by an amendment in 2000 to include the above-referenced independent contractor exclusion therefrom. This contention is wrong. The definition of "employee" cited by the *Walls* Court contains the same independent contractor exclusion as is present in the above-cited definition. *See Walls,* 629 A.2d at 236. Quite simply, the *Walls* Court reached its determinations using the present-day definition of "employee." Accordingly, *Walls* remains good law and has not bee overruled, as suggested by the County Defendants. Therefore, we proceed to apply the dictates of *Walls* and *Higby* to the case *sub judice.*

■ In making the determination as to whether an employee-employer relationship or an independent contractor relationship was present, the following factors are considered: (i) who controls the manner of work to be performed; (ii) the responsibility for the result; (iii) the terms of agreement between the parties; (iv) the nature of the work or occupation; (v) the skill required for the performance; (vi) whether one is engaged in a distinct occupation or business; (vii) which party supplies the

---

54). Expert testimony is not required, however, when the medical malpractice is self-evident. *Griffin v. Univ. of Pittsburgh Med. Ctr.–Braddock Hosp.,* 950 A.2d 996, 999–1000 (Pa.Super.2008).

**45.** Dr. Maue actually posits two immunity arguments. The first is based in the Political Subdivision Tort Claim Act, 42 Pa.C.S. § 8501 *et seq.* (2001) (the "PSTCA"), and the second is grounded in the Mental Health Procedures Act, 50 P.S. § 7114(a) (1978) (the "MHPA").

**46.** Dr. Maue correctly notes that for the purposes of the PSTCA an "employee" is defined as:

Any person who is acting or who has acted on behalf of a government unit whether on a permanent or temporary basis ... whether within or without the territorial boundaries of the government unit ... designated to act for the government unit. Independent contractors under contract to the government unit and their employees and agents and persons performing tasks over which the government unit has no legal right of control are not employees of the government unit.
42 Pa.C.S. § 8501.

tools; (viii) whether payment is by the time or by the job; (ix) whether the work is part of the regular business of the employer; and (x) whether there is a right to terminate the employment at any time. *Higby*, 954 A.2d at 85 (quoting *Helsel v. Complete Care Servs., LP*, 797 A.2d 1051 (Pa.Commonw.Ct.2002)).

▆▆ After a review of these factors, we believe that a reasonable jury could conclude that Dr. Maue functioned as an independent contractor for purposes of PSTCA immunity. This determination is based upon the following. First, the contract between NCP and Holy Spirit Hospital (through which Dr. Maue provided his psychiatric services) indicates that Dr. Maue controlled the manner in which his services were to be rendered, as it required him to examine inmates and pretrial detainees *as his schedule permitted.* (Rec. Doc. 88 Ex. B p. 3); *see generally Davidson v. Workmens' Comp. Appeal Bd.*, 42 Pa.Cmwlth. 30, 399 A.2d 1193 (1979) (stating that the most important factor in determining the nature of the employment relationship is the control of the manner in which the work is accomplished, and that retention of this control by the hiree indicates the existence of independent contractor relationship). Second, while the terms of the contract do not specifically refer to Dr. Maue as an "independent contractor," it does require him to maintain a separate insurance policy, which has the effect of reducing and/or eliminating the government's exposure for Dr. Maue's torts. *See Helsel*, 797 A.2d at 1056 (purpose of immunity is

to "limit governmental exposure to tort liability ...").[47] Further, the services provided by Dr. Maue required great skill. *See generally Davidson*, 42 Pa.Cmwlth. 30, 399 A.2d 1193 (the fact that a great level of skill is required to perform the task for which one was hired militates in favor of finding an independent contractor relationship). Additionally, Dr. Maue was a psychiatrist, a profession that was obviously not the regular business of NCP. *See Gniewek v. 1700 Place Apartments*, 435 Pa.Super. 479, 646 A.2d 1196, 1198 (1994) (an independent contractor relationship exists when the work is not part of the regular business of the employer). Finally, per the service contract with NCP, Dr. Maue was paid per job, not per hour. *See Cox v. Caeti*, 444 Pa. 143, 279 A.2d 756, 758 (1971) (individuals paid by the hour are more likely to be classified as independent contractors, whereas those who receive hourly wages tend be classified as employees).

We believe that the foregoing factors could lead a reasonable jury to conclude that Dr. Maue was providing psychiatric services at NCP as an independent contractor, not as an employee of Northumberland County. Accordingly, we conclude that Dr. Maue does not qualify for the immunity granted by the PSTCA and therefore cannot use such an argument to defeat the state medical malpractice claim lodged against him.[48] Accordingly, we will deny the Maue MSJ to this extent.

▆▆ Dr. Maue's second immunity argument, the provision of the Mental

---

**47.** Since Dr. Maue has his own insurer, as was required by the service contract, claims made against him would not necessarily affect the Northumberland County treasury. Accordingly, this factor also militates in favor of a finding that PSTCA immunity was not designed to cover Dr. Maue's services, making him an independent contractor, not an employee.

**48.** This conclusion does no violence to our previous determination that Dr. Maue acted under the color of state law for purposes of § 1983. *See Pokalsky v. Southeastern Pennsylvania Trans. Auth.*, 2002 WL 1998175 *9 (E.D.Pa.2002) (for the proposition that an individual can act under color of state law for purposes of § 1983 liability, but yet can be an independent contractor for purposes of PSTCA immunity).

Health Procedures Act upon which he relies states, in relevant part:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other authorized person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or for any of its consequences.

50 P.S. § 7111(a)(emphasis added). We have already determined that a reasonable jury could infer that Dr. Maue acted with reckless indifference. Recklessly indifferent conduct is more deviant than gross negligence. *Unger v. Allen*, —— Pa. Cmwlth. ——, —— A.2d ——, 2006 WL 5780005 (Pa.Com.Pl.2006). Accordingly, a reasonable jury could find that Dr. Maue's conduct was grossly negligent. Since the vesting of MHPA immunity is based upon the absence of gross negligence, we cannot shield Dr. Maue with that immunity. Consequently, we will deny the Maue MSJ to this extent.

We now turn to Dr. Maue's third and final argument for summary judgment on the medical malpractice claim, which revolves around a perceived lack of evidence to establish the requisite elements of a medical malpractice cause of action. To recapitulate, in order to established a claim for medical malpractice, a plaintiff must show the following: "(i) a duty owed by the physician to the patient; (ii) a breach of that duty by the physician; (iii) that the breach was the proximate cause of the harm suffered; and (iv) that the damages suffered were a direct result of the harm." *Freed*, 971 A.2d at 1206 (citing *Hightower–Warren*, 698 A.2d at 54).[49] Specifically, Dr. Maue claims that summary judgment in his favor is appropriate because there is a lack of evidence to establish duty and/or causation in relation to Dr. Maue's documentation of Mr. Francis' medical records.

■■■■■ Dr. Douglas Anderson, a board certified psychiatrist, testified, "By examining Mr. Francis and making recommendations with respect to his care and treatment, Dr. Maue established a bona fide doctor/patient relationship with him, [which] required that … Dr. Maue take appropriate and adequate measures to protect Mr. Francis from self-harm." Douglas Anderson Dep. 24:8–17, March 11, 2009. However, we are aware that the question of whether a duty exists is a legal one. *Brisbine v. Outside In School of Experiential Educ., Inc.*, 799 A.2d 89, 95 (Pa.Super.2002). To that end, we note that a duty of care arises when a physician-patient relationship is established. *Winschel v. Jain*, 925 A.2d 782, 796 (Pa.Super.2007). Dr. Maue evaluated and treated individuals housed at the NCP, and we believe that this is sufficient to establish a professional duty of care. *See Blaner v. IDEC Pharm. Corp.*, 58 Pa. D. & C. 4th 129, 134 (Pa.Com.Pl.2002) (for the proposition that a duty of care is imposed

---

**49.** As aforestated, "Expert testimony generally is required in a medical malpractice action in order to establish the proper standard of care, the defendant's failure to exercise that standard of care, and the causal relationship between the failure to exercise the standard of care and the plaintiff's injury." *Freed*, 971 A.2d at 1206 (citing *Hightower–Warren*, 698 A.2d at 54). However, expert testimony is not required when the medical malpractice is self-evident. *Griffin*, 950 A.2d at 999–1000.

upon physicians responsible for the care of the patient).[50] This means that the first element of the medical malpractice cause of action can be established through the record evidence.

■■■■ The duty arising in the instant circumstances required Dr. Maue, in the treatment of Mr. Francis, to "possess and employ ... the skill and knowledge usually possessed by physicians in the same or a similar locality ... and in [doing so] exercise the care and judgment of a reasonable man." *Winschel v. Jain*, 925 A.2d 782, 797 (Pa.Super.2007). We have already established that a jury could reasonably infer reckless indifference on the part of Dr. Maue. This determination would necessarily mean that Dr. Maue was in derogation of his duties and thus, the second element of the medical malpractice cause of action can be established from record evidence. Further, the fourth element can also be established through the record evidence, as we know that Mr. Francis' suicide was the harm engendered by Dr. Maue's alleged breach of duty. Accordingly, the only remaining element to establish is the third element—causation.

■■■■ Dr. Maue asserts that causation cannot be established for a multitude of reasons. First, he contends that there is no evidence that his documentation of Mr. Francis' watch level would have impacted the custodial status of Mr. Francis.[51] We are not persuaded by this contention. There is record evidence from which a reasonable jury could infer that Nurse Wojcik looked at Dr. Maue's notes prior to examining Mr. Francis on March 8, 2006.[52] Further, there is testimony that if those notes contained references to Mr. Francis' suicide watch level or to Dr. Maue's discussion with Lieut. Bruce regarding same, Nurse Wojcik would have realized that Mr. Francis was on suicide watch, not a customary new commitment watch. If she came upon such knowledge, Nurse Wojcik testified that she never would have informed Guard Wheary that Mr. Francis would be removed from watch. We believe that a reasonable jury could conclude that if Mr. Francis was not removed from watch, he would not have had the opportunity to commit suicide. Accordingly, we reject Dr. Maue's argument that his failure to appropriately doc-

50. The fact that Dr. Maue examined Mr. Francis at the behest of NCP, and without being selected by Mr. Francis, does no violence to this determination. As we have noted, the Fourteenth Amendment entitles pretrial detainees to essential health care. As aforementioned, pretrial detainees are not entitled to select their health care provider, they are under the medical care of the physicians employed by each correctional facility. Accordingly, the pretrial detainees rely on those physicians to provide adequate medical care so that their health does not deteriorate, and the correctional facilities rely on the physicians to provide the same so that the facilities operate within constitutional bounds. Therefore, we believe that Dr. Maue had a professional duty both to Mr. Francis and to NCP.

51. While Dr. Maue contends that recordation of this information was not customary and that he therefore had no duty to memorialize same, his amendment of the medical record, after Mr. Francis' death, to include this information could reasonably belie his contention. Further, Nurse Wojcik testified that it was indeed customary for Dr. Maue to record an inmate's suicide watch level in the medical record. Accordingly, we believe that this is evidence from which a reasonable jury could infer that Dr. Maue had a duty to record this information.

52. Although Nurse Wojcik could not specifically remember if she looked at the notes prepared by Dr. Maue prior to conducting her examination of Mr. Francis, she also testified that it was her custom and practice to look at the notes of the psychiatrist prior to examining new inmates if those notes were available. Since Dr. Maue's notes were available, a reasonable jury could infer that Nurse Wojcik did in fact read them prior to examining Mr. Francis on March 8, 2006.

ument Mr. Francis' medical records did not have an impact upon Mr. Francis' removal from suicide watch.

 Dr. Maue's second argument is that it was not reasonably foreseeable that NCP officials would ignore his verbal recommendation that Mr. Francis be maintained on close suicide watch.[53] This argument, at its core, posits that Dr. Maue cannot be held liable for medical malpractice because the conduct that facilitated the injury was not foreseeable. In Pennsylvania, the fact that an actor engages in conduct and does not reasonably foresee the extent or manner of harm which the conduct will cause does not preclude liability, unless it appears to the court that the harm was a highly extraordinary consequence of the conduct. *Wisniewski v. Great Atlantic & Pac. Tea Co.*, 226 Pa.Super. 574, 323 A.2d 744, 748 (1974) (*cited in Deere & Co. v. Reinhold*, 2000 WL 486607 *7 (E.D.Pa.2000)).

Presumably, the reason why medical records are maintained at NCP is to memorialize the procedures and treatment plans being taken to care for the inmates so that this care may be maintained or altered in the future as may be appropri-

ate to effectively combat changes in the inmates' health. Accordingly, we believe that it should have been foreseeable that a failure to properly document treatment procedures in Mr. Francis' medical record could have resulted in harm to Mr. Francis. Since Mr. Francis' suicide was not a highly extraordinary consequence of failing to properly memorialize treatment procedures or plans in his medical record, we do not believe that any unforeseeable conduct on behalf of NCP officials absolves Dr. Maue from liability. The fact that NCP officials ignored Dr. Maue's verbal recommendations with regard to Mr. Francis' suicide watch does not exonerate Dr. Maue from the liability attached to his negligent failure to document the suicide watch in Mr. Francis' medical records precisely because the harm occasioned by that failure was of a type that proper recordation was designed to prevent.[54] Consequently, we reject this argument.

 Dr. Maue's last argument asserts that there is no causation because the true cause of Mr. Francis' suicide was the NCP officials' failure to properly record Mr. Francis' suicide watch where they were obligated to do so.[55] While it may be true

---

**53.** In this vein, we note that NCP policy dictated that only Dr. Maue or Warden Reish could remove suicide watches. Further, Dr. Anderson testified that "it is reasonable for a psychiatrist to anticipate that the facilities in charge of the custody of a patient will follow its routine custom and practices as well as its policies ..." Anderson Dep. 42.

**54.** We are aware that the prison officials likely would not have had access to Mr. Francis' medical records and therefore proper recordation therein would not have put these officials on notice of Mr. Francis' suicide level. However, Nurse Wojcik did have access to the medical records and therefore proper recordation therein would have placed her on notice of Mr. Francis' condition. Since Nurse Wojcik testified that shift lieutenants were responsible for communicating suicide levels at the beginning of each shift, we can only

conclude that Dr. Maue's recordation of suicide levels in the inmates' medical records is designed to ensure that Nurse Wojcik and other medical personnel were aware of the inmates' conditions so that they could appropriately treat the condition and, in doing so, avoid any actions that could exacerbate the same. Unfortunately, proper recordation did not occur and Nurse Wojcik engaged in conduct that was deleterious to Mr. Francis' condition. Quite clearly, Nurse Wojcik's actions could have been prevented by proper recordation of Mr. Francis' condition. Accordingly, we conclude that the harm sustained by Mr. Francis was a foreseeable consequence of failing to properly record his condition in his medical record.

**55.** As support for this proposition, Dr. Maue specifically refers to the security check sheet

that the conduct of NCP officials, at a minimum, rose to the level of negligence, that does not alter the fact that Dr. Maue's failure to properly memorialize information in Mr. Francis' medical records was a but-for cause of his suicide.[56] While it is clear to us that the harm suffered by Mr. Francis could have been prevented if Dr. Maue properly discharged his duties, it is also clear that that harm could have been avoided if NCP officials properly discharged their duties. It was the confluence of the degradation of these duties by both parties that caused harm to Mr. Francis. However, one party's derogation of it's duty does not exonerate the other party's negligence. *See Boutte v. Seitchik,* 719 A.2d 319 (Pa.Super.1998) (for the proposition that multiple parties may be held liable as "joint tortfeasors" when their independent negligent actions unite to cause a single harm). Accordingly, we are unpersuaded by Dr. Maue's argument that he is not liable because NCP officials were also negligent.

■■■ Since we find all of Dr. Maue's arguments relative to his failure to document unavailing, we will deny the Maue MSJ to this extent.[57] Further, since we see no viable reason to grant summary judgment on the medical malpractice claims, we will deny the Maue MSJ to this extent.

The Maue MSJ next addresses the wrongful death cause of action. Wrongful death actions accrue directly to certain beneficiaries—i.e. the spouse, children, or parents—of a decedent who has been wrongfully killed. 42 Pa.C.S.A. § 8301 is Pennsylvania's wrongful death statute. It states, in pertinent part, "An action may be brought ... to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another...." 42 Pa. C.S.A. § 8301 (2007). In requesting summary judgment on this cause of action, Dr. Maue interposes the same arguments as those directed towards the medical malpractice cause of action. As we have stated, we do not believe that Dr. Maue is entitled to the immunity granted by either the PSTCA or the MHPA. Further, in determining that a reasonable jury could conclude that Dr. Maue was guilty of medical malpractice, we have already relayed our belief that a reasonable jury could conclude that Dr. Maue's negligent actions caused Mr. Francis' death. Accordingly, it is our opinion that a reasonable jury could find that Dr. Maue is liable for wrongful

---

that listed the reason for Mr. Francis' check as being a "new commitment" not a "suicide risk."

**56.** After all, if such documentation was made, Nurse Wojcik would have been aware that Mr. Francis was on suicide watch and therefore would have denied Guard Wheary's request to remove him therefrom.

**57.** We also take time to note that it is our opinion that Dr. Maue is not entitled to summary judgment on his medical malpractice claim insofar as that action is based upon his failure to accurately communicate the appropriate suicide watch level to NCP officials. Doing so was certainly part of his duties as the NCP psychiatrist. He breached this duty when he instructed that Mr. Francis be under

a "close watch" when in fact he believed that the protocols associated with a "constant watch" were appropriate given Mr. Francis' extreme suicidality. Without this breach, Mr. Francis would not have had the opportunity to commit suicide because he would have been confined in a maximum security cell without any fixtures from which to hang himself. Further, inmate suicide is certainly a foreseeable consequence of failing to appropriately monitor a suicidal inmate. Finally, this breach resulted in Mr. Francis' death. Accordingly, all elements of a medical malpractice actions have been satisfied in relation to Dr. Maue's failure to communicate the appropriate suicide watch level. We will deny the Maue MSJ insofar as it requests judgment to this extent.

death. Therefore, we will deny the Maue MSJ to this extent.

We now turn to our consideration of the contribution and indemnity issues. The County Defendants have made a claim for contribution and indemnity against Dr. Maue, who has likewise lodged those claims against the County Defendants. Any defendant who is compelled to pay more than the percentage share attributed to it based on the amount of its causal negligence may seek contribution against the other defendants to recover the excess amount paid. 42 Pa.C.S. § 7102(b). Further, "[i]ndemnity is a common law remedy which shifts the entire loss from one who has been compelled ... to pay a judgment occasioned by the initial negligence of another who should bear it." *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 549 Pa. 613, 702 A.2d 850, 854 (1997) (citations omitted). "It is not a fault *sharing* mechanism ... it is a fault *shifting* mechanism [where a defendant] seeks to recover his loss from a defendant who was actually responsible for the accident which occasioned the loss." *Id.* (quoting *Sirianni v. Nugent Brothers Inc.*, 509 Pa. 564, 506 A.2d 868, 871 (1986) (emphasis added)).

With this in mind, we note that the Release specifically states that, in remitting $360,000 to the Plaintiff in exchange for release from liability, the County Defendants admitted no fault relative to Mr. Francis' death. We have already determined that a reasonable jury could determine that Dr. Maue is liable on the claims contained in the Third Party Complaint and Plaintiff's cross claim. Accordingly, if a jury were to determine that the $360,000 overstated the County Defendants' actual fault and compensated the Plaintiff for a portion of the fault attrib-

uted to Dr. Maue, the County Defendants would be entitled to recover that portion from Dr. Maue by way of contribution. If a jury were to determine that Dr. Maue was at fault but the County Defendants were not at all at fault, the County Defendants would be entitled to indemnity from Dr. Maue. Consequently, we find unavailing Dr. Maue's argument that the Release makes the County Defendants' indemnification claim irrelevant because it acknowledges that the County Defendants are protected from being called upon to pay for Dr. Maue's conduct.[58] Accordingly, we will deny the Maue MSJ insofar as it requests summary judgment on the contribution/indemnity claim found in the Third Party Complaint.

Further, we deny the contribution/indemnity claim found in Dr. Maue's counterclaim, since we have already held that a reasonable jury could find that he is liable on the claims expressed in the Third Party Complaint and cross claim. If he were found liable, he would not be entitled to indemnity, and would not be entitled to contribution in the event that he did not pay damages in excess of the percentage share of his responsibility. We will deny the Maue MSJ insofar as it requests summary judgment against the County Defendants on the contribution/indemnity claim found in Dr. Maue's counterclaim. This concludes our analysis of the Maue MSJ.

### D. The County–Maue MSJ

The County–Maue MSJ addresses the claims found in the Third Party Complaint and in Dr. Maue's counterclaim against the County Defendants. Accordingly, we address these claims in sequence, noting that since this is the motion of the County

---

**58.** Indeed, in stating the County Defendant will not be held liable for the conduct of Dr. Maue, the Release only fortifies the County Defendants' right to contribution/indemnity should a jury find that they did not bear fault up to $360,000.

Defendants, we must construe all facts in the light most favorable to Dr. Maue.

### i. Third Party Complaint

As we have already noted, the Third Party Complaint contains the following viable claims: (i) denial of adequate medical care in violation of the Fourteenth Amendment; (ii) medical malpractice; and (iii) wrongful death.[59]

■ We previously determined that a reasonable jury could conclude that Dr. Maue was recklessly indifferent to the medical needs of Mr. Francis as a result of his failure to adequately communicate to prison officials the need for Mr. Francis to be constantly supervised, and as a result of his failure to adequately document Mr. Francis' medical records. To recapitulate, "Reckless indifference" is established when a defendant "know[s] of and disregard[s] an excessive risk to inmate health or safety." *Natale v. Camden County Corr. Facility,* 318 F.3d 575, 582 (3d Cir. 2003). While Dr. Maue has adduced evidence that the proper watch level for Mr. Francis was the 15 minute "close watch" he prescribed,[60] (Rec. Doc. 118–4),[61] it is clear from Dr. Maue's own deposition testimony that he believed Mr. Francis should have been under constant supervision and that he intended to prescribe such a watch level. While we have strong reservations about the accuracy of Dr. Spruiell's testimony in light of Dr. Maue's own admissions, it is not our task to make factual determinations, and we believe that Dr. Spruiell's testimony sufficiently establishes a question of fact for the jury. Accordingly, we believe that a reasonable jury could determine that a "close watch" was appropriate and constituted all that was required under the given circumstances, and that Dr. Maue's intention to place Mr. Francis on "constant watch" was merely a manifestation of Dr. Maue being overly cautious under the circumstances. Under such conditions, a reasonable jury could infer that Dr. Maue did not ignore an excessive risk to Mr. Francis' safety because he did not fail to communicate the appropriate suicide level that was warranted under the circumstances. Since a reasonable jury could infer that Dr. Maue was not recklessly indifferent in communicating the appropriate suicide level to NCP officials, we will deny the County–Maue MSJ in regards to the Fourteenth Amendment claim to this extent.

We also believe that a reasonable jury could conclude that Dr. Maue was not recklessly indifferent with regard to his failure to properly document Mr. Francis' medical records. The essence of this claim is that Dr. Maue failed to properly notify

---

**59.** As previously stated, we will not substantively address the survival claim at this juncture of the litigation because we interpret that claim to be lodged for the purpose of damages.

**60.** The testimony we rely on is from Dr. Graham Spruiell ("Dr. Spruiell"), who stated that patients such as Mr. Francis, who exhibit suicidal thoughts (i.e. suicidal ideation) without expressing a specific intent to carry through with those thoughts, need only be placed on 15 minute checks rather than on constant observation. (Rec. Doc. 118–4 p. 4).

**61.** Dr. Spruiell's opinion was attached as an exhibit to Dr. Maue's response to County Defendants' statement of facts, which was filed after his brief in opposition and the County Defendants' reply brief. In their reply brief, the County Defendants argue that since the exhibit was not attached to the brief in opposition and was not otherwise lodged on the docket, we cannot consider the opinions expressed therein. However, we do not understand County Defendants to claim that the exhibit was not produced during discovery and therefore do not discern them to claim undue surprise or prejudice. Therefore, since the exhibit is now filed on the docket, we can and will take cognizance of the opinions contained therein.

Nurse Wojcik of the fact that Mr. Francis was on suicide watch.[62] It is undisputed that Dr. Maue communicated with Lieut. Bruce and Warden Reish with respect to placing Mr. Francis on suicide watch. Further, Dr. Maue has testified that it was not customary for him to note suicide watch levels in the medical records of prisoners.[63] Additionally, both Dr. Maue and Nurse Wojcik testified that suicide watch levels were of a class of information that was to be communicated through shift lieutenants. Accordingly, we believe that reasonable jurors could determine that Dr. Maue was not recklessly indifferent to Mr. Francis' medical needs when he failed to memorialize Mr. Francis' watch level in his medical records because Dr. Maue was not responsible for communicating such information to Nurse Wojcik. Therefore, we will deny the County–Maue MSJ with respect to the Fourteenth Amendment claim to this extent.

In regards to the medical malpractice claim contained in the Third Party Complaint, we again note that in order to establish a claim for medical malpractice, a plaintiff must show the following: "(i) a duty owed by the physician to the patient; (ii) a breach of that duty by the physician; (iii) that the breach was the proximate cause of the harm suffered; and (iv) that the damages suffered were a direct result of the harm." *Freed,* 971 A.2d at 1206.

■ Since Dr. Maue undertook the care and treatment of Mr. Francis, we believe he had a duty to act in Mr. Francis' best medical interests. Certainly, this would include accurately communicating

the appropriate suicide level to NCP officials and including in Mr. Francis' medical records all information that he was to communicate to other medical personnel at NCP so that Mr. Francis' medical care could be appropriately maintained. As we noted above, Dr. Spruiell's opinion provides evidence from which a jury could infer that the appropriate suicide watch level for Mr. Francis was a "close watch." Since Dr. Maue did in fact communicate the need for a close watch to Lieut. Bruce and Warden Reish, there is evidence from which a reasonable jury could conclude that Dr. Maue did not breach his duty to accurately communicate the appropriate suicide watch level to NCP officials. Further, we believe that a reasonable jury could conclude that Mr. Francis had no duty to inform Nurse Wojcik of Mr. Francis' suicide watch level by recording it in the medical records, as there is evidence that such recordation was not customary and that such information was to reach Nurse Wojcik through the staff lieutenant on duty on the day in question. Accordingly, we believe that there is evidence from which a reasonable jury could conclude that Dr. Maue was not professionally negligent with regard to his care or treatment of Mr. Francis. We will therefore deny the County–Maue MSJ to this extent it involves the medical malpractice claim contained in the Third Party Complaint.

With regard to the wrongful death claim contained in the Third Party Complaint, we again note that such actions may be brought "to recover damages for the death

---

**62.** Any claim that Dr. Maue failed to notify Nurse Wojcik of Mr. Francis' suicidality is contradicted by record evidence, as it is clear that Dr. Maue documented Mr. Francis' suicidal ideation in the medical record.

**63.** Construing the facts in the light most favorable to Dr. Maue, we must take him at his word that his *post hoc* addendum of Mr.

Francis' medical records to include the suicide watch level was done in order to get a more complete picture of the events leading up to the suicide, and not as an attempt to cover himself in the event of any potential litigation, and is therefore not an admission that such information should have been included in the medical record in the first instance.

of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another...." 42 Pa.C.S.A. § 8301. Since we have determined that a reasonable jury could conclude that Dr. Maue was not negligent in his care or treatment of Mr. Francis, a reasonable jury could also conclude that the absence of such negligence precludes liability on the wrongful death claim. Accordingly, we will deny the County–Maue MSJ to this extent.

Finally, the County–Maue MSJ requests summary judgment in favor of the County Defendants on their contribution/indemnity claim against Dr. Maue. Since Dr. Maue's liability, and the extent thereof, has not been established, these are questions for the jury to determine. Therefore, we will deny the County–Maue MSJ to this extent. Accordingly, we will deny the County–Maue MSJ insofar as it relates to the claims in the Third Party Complaint.

### ii. Dr. Maue's Counterclaim

Dr. Maue's counterclaim incorporates by reference the Plaintiff's complaint against the County Defendants and also includes a claim for contribution and/or indemnification against the County Defendants. To restate, the Plaintiff's complaint contains the following causes of action: (i) reckless conduct/deliberate and intentional conduct; (ii) Fifth and Fourteenth Amendment reckless indifference, made pursuant to 42 U.S.C. § 1983 ("§ 1983"); (iii) Fifth and Fourteenth Amendment failure to train, pursuant to § 1983; (iv) Eighth Amendment cruel and unusual punishment, pursuant to § 1983; (v) wrongful death, pursuant to 42 Pa.C.S.A. § 8371; and (vi) survival action, pursuant to 42 Pa.C.S.A. § 8302; 20 Pa.C.S.A. § 3371.

 As a preliminary matter, we will briefly note that Dr. Maue cannot maintain numerous causes of action incorporated into his counterclaim. First, as a threshold matter, the claims against the John Doe Defendants must be dismissed because the real parties in interest have not been substituted prior to the expiration of the statute of limitations.[64] The limitations period applicable to all causes of action in this case is two years. *See* 42 Pa.C.S. § 5524(7) (establishing a two-year statute of limitations for an "action or proceeding to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct ..."); *Garvin v. City of Philadelphia*, 354 F.3d 215, 220 (3d Cir.2003) (civil rights and constitutional tort claims are subject to the same statute of limitations period as state personal injury claims). The statute of limitations begins to run when a plaintiff knew or should have known of the injury upon which the action is based. *Wilson v. El–Daief*, 964 A.2d 354, 356 (Pa.2009).

 The injury upon which all claims are based accrued on March 9, 2006, the date of Mr. Francis' suicide. Accordingly, the statute of limitations expired on March 9, 2008. Since the replacement of a "John Doe" defendant with a named party introduces a new party into the litigation, the conditions of Federal Rule of Civil Procedure 15(c) must be met in order for the amendment to "relate back" to the initial complaint, thereby satisfying the statute of limitations. *Britt v. Arvanitis*, 590 F.2d 57, 62 (3d Cir.1978). The requirements of this provision are that: "(i) the basic claim must have arisen out of the conduct set forth in the original pleading; (ii) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (iii) that party must or should have known that, but for a mistake concerning identity, the action would have been brought

---

**64.** Quite notably, Dr. Maue fails to address this issue in his brief in opposition.

against it; and (iv) the second and third requirements must have been fulfilled within the prescribed limitations period." *Schiavone v. Fortune*, 477 U.S. 21, 29, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1990). Discovery in this case concluded on April 15, 2009. Accordingly, we believe that the addition of any party to the litigation at this late stage would undoubtedly prejudice it in maintaining a defense. Accordingly, the dictates of Rule 15(c) cannot be satisfied by Dr. Maue as to the introduction of any new named defendants. Accordingly, any attempt to introduce a newly named party into the litigation would violate the statute of limitations.

■■■ Further, John Doe defendants may only be allowed "to stand in for the alleged real parties until discovery permits the intended defendants to be installed." *Johnson v. City of Erie*, 834 F.Supp. 873, 878 (W.D.Pa.1993) (citations omitted). Therefore, absent compelling reasons, district courts may dismiss John Doe defendants when the plaintiff, after being granted a reasonable period of discovery, fails to identify them. *Scheetz v. Morning Call, Inc.*, 130 F.R.D. 34, 37 (E.D.Pa.1990) ("Fictitious parties must eventually be dismissed, if discovery yields no identities."). This case was initiated on November 29, 2006, and Dr. Maue was made a party on August 27, 2008. We believe that the April 15, 2009 discovery deadline provided ample time to ascertain the identity of the John Doe defendants, and Dr. Maue has never indicated otherwise. Accordingly, we will not permit Dr. Maue to retain the fictitious John Doe defendants as parties

to his counterclaim. Since Dr. Maue cannot amend his counterclaim to include the real parties in interest, and since we will not permit the fictitious defendants to remain in this action, we will dismiss those Defendants with prejudice from the instant action. The County–Maue MSJ is granted to this extent. Therefore, the following discussion will only pertain to Defendant Northumberland County and Defendant Warden Reish.[65]

■■■ In addition to the dismissal of the claims against the John Doe Defendants, the brief in support argues that the Fifth and Eighth Amendment claims against the remaining defendants should be dismissed, as they are not cognizable in the case *sub judice*. As noted above, Eighth Amendment claims are not sustainable in this case because Mr. Francis was a pretrial detainee and the protections provided by that Amendment apply only to convicted prisoners. However, Mr. Francis is entitled to similar protections pursuant to the Due Process Clause. Since Northumberland County and Warden Reish are state actors, not federal actors, the Fourteenth Amendment, not the Fifth Amendment, is the appropriate source of due process protection in this case. Accordingly, we will grant the County–Maue MSJ insofar as it seeks judgment in favor of the County Defendants on the Fifth and Eighth Amendment claims contained in Dr. Maue's counterclaim.

The only remaining claims in Dr. Maue's counterclaim are: (i) the Fourteenth Amendment inadequate care claim pursuant to § 1983;[66] (ii) the Fourteenth

---

65. Hereafter, we will use the phrase "County Defendants" only to refer to Defendant Northumberland County and Defendant Warden Reish.

66. While the counterclaim incorporates the Plaintiff's complaint, which includes separate causes of action for reckless conduct/deliberate and intentional conduct and Fourteenth

Amendment reckless/deliberate indifference, it is clear from the complaint that the former claim is merely an extension of the latter claim, meant to illustrate the conduct that was allegedly recklessly/deliberately indifference. Therefore, we will consolidate both counts into the Fourteenth Amendment inadequate care claim.

Amendment failure to train claim pursuant to § 1983; (iii) the wrongful death claim pursuant to 42 Pa.C.S.A. § 8371; and (iv) the claim for contribution/indemnity against the County Defendants. We will address these in turn.

 With regard to § 1983 actions, a municipality is liable under that provision "when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict the injury." *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality is not liable under § 1983 unless a "policy" is the moving force behind the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The County Defendants argue that there is no evidence indicating that Northumberland County had a policy or custom of any kind and therefore request summary judgment in their favor with respect to the § 1983 claims lodged against Northumberland County. Dr. Maue does not address this argument in his brief in opposition, and we note that it is not the Court's responsibility to dredge through record evidence to find questions of material fact, *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*,

442 F.3d 812, 820 (3d Cir.2006) ("Judges are not like pigs, hunting for truffles buried in the record.") (citations omitted). Nonetheless, we have made a concerted effort to locate evidence of such a policy or custom and have failed in that endeavor.[67] Since we cannot locate any evidence from which a policy or custom of any kind can be attributed to Northumberland County, and since Dr. Maue has not alerted us to same, we will dismiss the § 1983 inadequate care and failure to train claims against Northumberland County.

 With regard to the § 1983 claims lodged against Warden Reish, we believe that the record is completely bereft of any evidence that would indicate reckless or deliberate indifference on his part. This determination is based on the following facts. Warden Reish was concerned about Mr. Francis' health immediately upon Mr. Francis' arrival at NCP, and therefore asked Dr. Maue to do an emergency evaluation of Mr. Francis. Warden Reish placed Mr. Francis on "close watch" until Dr. Maue arrived. After the emergency evaluation, Dr. Maue, the prison psychiatrist, recommended that Mr. Francis remain on "close watch." Warden Reish followed that recommendation.[68] There is no reason to believe that, at the

---

**67.** Indeed, the only evidence of a policy was the suicide policy in place at NCP. There is ample evidence that this policy established certain protocols for the diagnosis and care of individuals who presented a suicide risk. While there is also evidence from which a reasonable jury could infer that at least one individual at NCP failed to carry out these protocols, that failure does not indicate that the policy was ineffective. There is no evidence to indicate that, if properly followed, the policy was ineffective. Accordingly, we do not believe that there is evidence that NCP failed to implement an effective suicide policy. Further, there is no evidence that there was at NCP an informal custom of disregarding the dictates set forth in the suicide policy. Consequently, we do not believe that a rea-

sonable jury could determine that a viable *Monell* claim exists.

**68.** "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with ... deliberate indifference." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir.2004) (addressing Eighth Amendment deliberate indifference). We find this precedent applicable to the instant Fourteenth Amendment reckless/deliberate indifference issue because the same standard for such indifference applies to both the Eighth and Fourteenth Amendments. *See Simmons v. City of Philadelphia*, 947 F.2d 1042, 1067 (3d Cir.1991).

time of the events in question, Warden Reish knew that Mr. Francis was a extreme suicide risk or that he was the most suicidal inmate Dr. Maue ever examined,[69] hence there was no reason to believe that Dr. Maue's recommendation of "close watch" was inappropriate, given that fact that he is permitted to rely on the recommendations of Dr. Maue. Further, Dr. Maue himself testified that he did not inform Warden Reish that Mr. Francis should be continuously monitored. Accordingly, we do not find that Warden Reish believed, knew, or should have known that Mr. Francis should have been placed on a "constant watch" instead of "close watch." Therefore, we do not believe that there is record evidence from which a reasonable jury could infer that Warden Reish was recklessly/deliberately indifferent to Mr. Francis' medical needs in maintaining the "close watch" ordered by Dr. Maue.

■ Further, there is no record evidence that Warden Reish failed to communicate Mr. Francis' suicide watch level to the appropriate prison personnel so that that information could be disseminated to all who needed it. While it appears that at least some prison personnel were not following the protocols associated with a suicide watch, there is no evidence that Warden Reish knew or should have known of such failures. Finally, there is no record evidence that Warden Reish was aware, or should have been aware, that Nurse Wojcik had removed Mr. Francis from his suicide watch until after his death. Accordingly, we do not believe that a reasonable jury could find that Warden Reish was recklessly/deliberately indifferent with regard to Mr. Francis' removal from suicide watch.[70] Therefore, we shall grant the County–Maue MSJ to this extent.

■ We turn next to the failure to adequately train or supervise. While such claims are typically levied against municipalities, it appears that Dr. Maue has incorporated this claim against Warden Reish himself. To establish such a claim, Dr. Maue must: "(i) identify specific training not provided that could reasonably be expected to prevent the suicide that occurred, and (ii) . . . demonstrate that the risk reduction associated with the proposed training is so great and so obvious

---

**69.** In fact, there is uncontradicted testimony that Warden Reish first learned of this information after Dr. Maue's deposition.

**70.** At this juncture, we address Warden Reish's argument for qualified immunity. Again, we note that qualified immunity protects government officials performing discretionary functions so long as their conduct does not violate established constitutional rights of which a reasonable person would have known. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In some cases, the Third Circuit has implied that "the issue of qualified immunity is only relevant after a court has concluded that a constitutional violation has occurred. In that view, if there is no constitutional violation, there is no reason to reach the qualified immunity issue." Wright v. City of Philadelphia, 409 F.3d 595, 600 (3d Cir.2005) (citing Carswell v.Borough of Homestead, 381 F.3d 235, 237 (3d Cir.2004)) (internal citations omitted). In other cases, the Third Circuit has held that "a defendant is entitled to qualified immunity unless a plaintiff can prove both that a constitutional right has been violated, and then that the constitutional right violated was clearly established." Wright, 409 F.3d at 600 (citing Bennett v. Murphy, 274 F.3d 133, 136–37 (3d Cir.2002)). Under either interpretation, the outcome is identical; if there is no constitutional violation, the plaintiff does not have a cognizable claim.

In the case sub judice, we have determined the Warden Reish did not violate Mr. Francis' constitutional rights. Accordingly, whether we cloak Warden Reish with qualified immunity or decline to address the qualified immunity issue because there is no constitutional violation, meaning there is no cause of action, the outcome is the same. Dr. Maue cannot maintain his failure to train claim against Warden Reish.

that the failure ... to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991). We can find no record evidence indicating that Warden Reish failed to train his subordinates with regard to the execution of the protocols associated with care and supervision of suicidal inmates, or that he failed to adequately supervise his subordinates in the execution of these protocols.[71] Further, Dr. Maue has failed to point us towards any evidence that would indicate such a failure on the part of Warden Reish. Accordingly, we will grant the County–Maue MSJ as it pertains to the § 1983 failure to train/supervise claim lodged against Warden Reish.

We next address the wrongful death claim asserted against Northumberland County and Warden Reish. To restate, such actions may be brought "... to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another...." 42 Pa.C.S. § 8301. The PSTCA provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person."[72] 42 Pa.C.S. § 8541. However, the Pennsylvania General Assembly has waived immunity, permitting liability to be imposed, "where damages are recoverable at common law or under a statute creating a cause of action if the injury was caused by a person not protected by immunity; the injury was caused by negligent acts of the local agency, or its employees acting within the scope of their duties; and, the claim falls within one of eight enumerated exceptions in 42 Pa.C.S. § 8542(b)."[73] *Weaver v. Franklin County*, 918 A.2d 194 (Pa.Commonw.Ct.2007) (citations omitted). Since the allegedly negligent acts undergirding the wrongful death claim do not involve the any of the eight exceptions to governmental immunity, we find that Defendant Northumberland County is immune from liability with respect to the wrongful death claim.

As for Warden Reish, we note that the PSTCA states, "An employee of a local agency is liable for civil damages on account of any injury to a person or property caused by acts of the employee which are within the scope of his office or duties only to the same extent as his employing local agency and subject to the limitations imposed by this subchapter." 42 Pa.C.S. § 8545. "Essentially, this provision states the liability of local agency employees cannot exceed the liability of their employing agency." *Pettit v. Namie*, 931 A.2d 790, 798 (Pa.Commonw.Ct.2007). Accordingly,

---

**71.** We do not believe that it is reasonable to infer that Warden Reish failed to train and supervise his subordinates merely from the fact that there is evidence that reasonably indicates that his subordinates did not follow protocols. Their failure to follow protocols does not necessarily indicate that Warden Reish failed to train or supervise them with regard to same.

**72.** "Local agency" is defined to include government units other than the Commonwealth government, a definition that would encompass Northumberland County. *See* 42 Pa.C.S. § 8501.

**73.** These exceptions include: (i) the operation of motor vehicles; (ii) the care, custody or control of personal property; (iii) the care, custody or control of real property; (iv) a dangerous condition of trees, traffic controls and street lighting; (v) a dangerous condition of steam, sewer, water, gas or electric systems; (vi) a dangerous condition of streets; (vii) a dangerous condition of sidewalks; and (viii) the care, custody or control of animals. 42 Pa.C.S. § 8542(b). These exceptions must be strictly construed. *See Lindstrom v. City of Corry*, 563 Pa. 579, 763 A.2d 394 (2000).

since we find that Northumberland County is not liable on the wrongful death claim, Warden Reish is also not liable on the same. We will grant the County–Maue MSJ to this extent.[74]

Finally, we address the claims for contribution/indemnity found in the Third Party Complaint and in Dr. Maue's counterclaim. We will deny the County–Maue MSJ to the extent that it involves the contribution/indemnity claim found in the Third Party Complaint because that claim hinges on Dr. Maue's liability, which we have already determined is a question for the jury. However, we will grant the County–Maue MSJ insofar as it relates to the contribution/indemnity claim in Dr. Maue's counterclaim because we have found that a reasonable jury could not find the County Defendants liable on any of the counterclaims, meaning that they have nothing for which to reimburse Dr. Maue.

## V. CONCLUSION

For the reasons stated above, we will grant the County Motion to Supplement (Rec. Doc. 83), County–Plaintiff MSJ (Rec. Doc. 85), and the Maue Motion to Supplement (Rec. Doc. 111). We will grant in part and deny in part the County–Maue MSJ to the extent reflected above. (Rec. Doc. 88). Finally, we will deny the Maue MSJ (Rec. Doc. 86) in its entirety. Accordingly, the following Order shall enter.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The County Motion to Supplement (Rec. Doc. 83) is **GRANTED** in its entirety.
2. The County–Plaintiff MSJ (Rec. Doc. 85) is **GRANTED** in its entirety.
3. The Maue Motion to Supplement (Rec. Doc. 111) is **GRANTED** in its entirety.

4. The Maue MSJ (Rec. Doc. 86) is **DENIED** in its entirety.
5. The County–Maue MSJ (Rec. Doc. 88) is **GRANTED IN PART** and **DENIED IN PART** to the following extent:
 a. The County–Maue MSJ is **GRANTED** with respect to the following claims:
 
 i. All claims against John Doe Defendants contained in Dr. Maue's counterclaim.
 
 ii. The Fifth and Eighth Amendment claims contained in Dr. Maue's counterclaim and asserted against Northumberland County and Warden Reish.
 
 iii. The § 1983 inadequate care claim contained in Dr. Maue's counterclaim and asserted against Northumberland County and Warden Reish.
 
 iv. The § 1983 failure to train/supervise claim contained in Dr. Maue's counterclaim and asserted against Northumberland County and Warden Reish.
 
 v. The wrongful death claim contained in Dr. Maue's counterclaim and asserted against Northumberland County and Warden Reish.
 
 vi. The claims for punitive damages contained in Dr. Maue's counterclaim and asserted against Northumberland County and Warden Reish
 
 vii. The contribution/indemnity claims contained in Dr. Maue's counterclaim and asserted against Northumberland County and Warden Reish.

---

**74.** Since we have found the Dr. Maue cannot maintain any claims against the County Defendants, he is not entitled to punitive damages. We will grant the County–Maue MSJ to this extent.

b. The County–Maue MSJ is **DE-NIED** with respect to the following claims:

i. The § 1983 inadequate care claim contained in the Third Party Complaint.

ii. The medical malpractice claim contained in the Third Party Complaint.

iii. The wrongful death claim contained in the Third Party Complaint.

iv. The contribution/indemnity claim contained in the Third Party Complaint.

6. The John Doe Defendants are **DISMISSED** from this action.

7. All claims asserted in Dr. Maue's counterclaim are **DISMISSED.**

8. The case is **PLACED** on the October 2009 trial term. The case management dates associated with this term are as follows:

a. Pretrial Conference September 1, 2009
b. Jury Selection October 5, 2009